UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Department of Justice<br>Antitrust Division<br>450 Fifth Street, N.W. Suite 7000<br>Washington, D.C. 20530<br><br>and<br><br>COMMONWEALTH OF PENNSYLVANIA<br>14th Floor, Strawberry Square<br>Harrisburg, PA 17120<br><br>    Plaintiffs,<br><br>    v.<br><br>SINCLAIR BROADCAST GROUP, INC.,<br>10706 Beaver Dam Rd.<br>Hunt Valley, Maryland 21030<br><br>and<br><br>PERPETUAL CORPORATION,<br>1000 Wilson Blvd.<br>Suite 2700<br>Arlington, Virginia 22209<br><br>    Defendants. | CASE NO.<br><br>JUDGE:<br><br>FILED: |

**COMPLAINT**

The United States of America, acting under the direction of the Attorney General of the United States, and the Commonwealth of Pennsylvania, acting by and through its Attorney General, bring this civil action to enjoin the proposed acquisition of Perpetual Corporation

("Perpetual") by Sinclair Broadcast Group, Inc. ("Sinclair") and to obtain other equitable relief. The acquisition likely would substantially lessen competition in the sale of broadcast television spot advertising in the Harrisburg-Lancaster-Lebanon-York, Pennsylvania Designated Market Area ("HLLY DMA"), in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  Plaintiffs allege as follows:

## I. NATURE OF THE ACTION

1.  Pursuant to a Purchase Agreement dated as of July 28, 2013, Sinclair has agreed to purchase all of the outstanding voting securities of Perpetual for a total value of $963 million, inclusive of the acquisition of voting securities and payoff of certain indebtedness of Perpetual and its subsidiaries.  Perpetual owns broadcast television station WHTM-TV, the only ABC affiliate serving the HLLY DMA.

2.  Sinclair already operates two broadcast television stations in the HLLY DMA.  It owns and operates WHP-TV, the only CBS affiliate serving that market.  Sinclair also operates WLYH-TV, a CW affiliate, pursuant to an agreement with WLYH-TV's owner, Nexstar Broadcasting, Inc., including the day-to-day operation and management of WLYH-TV's advertising.  Accordingly, WHP-TV and WLYH-TV do not meaningfully compete with one another for advertisers.

4.  If consummated, Sinclair's acquisition of Perpetual would result in Sinclair owning or controlling the sale of advertising for three of six broadcast television stations selling advertising in the HLLY DMA:  WHP-TV (CBS affiliate), WHTM-TV (ABC affiliate) and WLYH-TV (CW affiliate).  Together, these stations account for approximately a 38% share of the gross revenues for broadcast television advertising in the HLLY DMA.

5. Currently, Perpetual (on behalf of WHTM-TV) and Sinclair (on behalf of WHP-TV and WLYH-TV) vigorously compete for the business of local and national companies that seek to advertise on broadcast television stations in the HLLY DMA. WHTM-TV and WHP-TV are particularly close competitors due to their respective affiliations with ABC and CBS, their news programming, and their viewership strengths in certain geographic areas. Advertisers benefit from the ability to substitute advertising placement between WHTM-TV and WHP-TV in particular, as well as among the three stations.

6. The acquisition would eliminate the head-to-head competition between Sinclair and Perpetual in the HLLY DMA and so eliminate the benefits of this competition. Unless blocked, the transaction is likely to lead to higher prices for broadcast television spot advertising in the HLLY DMA in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II. JURISDICTION AND VENUE

7. The United States brings this action pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

8. The Commonwealth of Pennsylvania brings this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. The Commonwealth, by and through its Attorney General, brings this action as *parens patriae* on behalf of the citizens, general welfare, and economy of Pennsylvania.

9. Sinclair and Perpetual sell broadcast television spot advertising, a commercial activity that substantially affects, and is in the flow of, interstate commerce, and commerce in the Commonwealth of Pennsylvania. The Court has subject-matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

10. Sinclair transacts business and is found in the District of Columbia, and is subject to the personal jurisdiction of this Court. All Defendants have consented to venue and personal jurisdiction in this District. Therefore, venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(c).

### III. THE DEFENDANTS

11. Sinclair is a Maryland corporation, with its headquarters in Hunt Valley, Maryland. Sinclair reported broadcast revenues of over $1.2 billion in 2013. Sinclair owns and operates, or provides programming, operating, or sales services to more than 145 stations in 70 markets. The broadcast television stations that Sinclair owns or operates include two in the HLLY DMA: WHP-TV, a CBS affiliate, and WLYH-TV, a CW affiliate.

12. Perpetual is a Delaware corporation, with its headquarters in Arlington, Virginia. Perpetual owns seven broadcast television stations in six markets throughout the United States, including WHTM-TV, the ABC affiliate in the HLLY DMA.

### IV. TRADE AND COMMERCE

**A.     Broadcast Television Spot Advertising is a Relevant Product Market**

13. Broadcast television stations attract viewers through their programming, which is delivered for free over the air or retransmitted to viewers, mainly through wired cable or other terrestrial television systems and through satellite television systems. Broadcast television

4

stations then sell advertising time to businesses that want to advertise their products to television viewers. Broadcast television "spot" advertising, which comprises the majority of a television station's revenues, is sold directly by the station itself or through its national representative on a localized basis and is purchased by advertisers who want to target potential customers in specific geographic areas. Spot advertising differs from network and syndicated television advertising, which are sold by television networks and producers of syndicated programs on a nationwide basis and broadcast in every market where the network or syndicated program is aired.

14. Broadcast television spot advertising possesses a unique combination of attributes that set it apart from advertising using other types of media. Television combines sight, sound, and motion, thereby creating a more memorable advertisement. Moreover, of all media, broadcast television spot advertising generally reaches the largest percentage of all potential customers in a particular target geographic area and is therefore especially effective in introducing, establishing, and maintaining the image of a product. For a significant number of advertisers, broadcast television spot advertising, because of its unique combination of attributes, is an advertising medium for which there is no close substitute. Other media, such as radio, newspapers, or outdoor billboards, are not desirable substitutes for broadcast television advertising. None of these media can provide the important combination of sight, sound, and motion that makes television unique and impactful as a medium for advertising.

15. Like broadcast television, subscription television channels such as those carried over cable or satellite television combine elements of sight, sound, and motion, but they are not a desirable substitute for broadcast television spot advertising for two important reasons. First, satellite, cable, and other subscription content delivery systems do not have the "reach" of broadcast television. Typically, broadcast television can reach well-over 90% of homes in a DMA, while cable television often reaches much less. Even when several subscription television

companies within a DMA jointly offer cable television spot advertising through a consortium called an interconnect, cable spot advertising does not match the reach of broadcast television spot advertising.  As a result, an advertiser can achieve greater audience penetration through broadcast television spot advertising than through advertising on a subscription television channel.  Second, because subscription services may offer more than 100 channels, they fragment the audience into small demographic segments.  Because broadcast television programming typically has higher rating points than subscription television programming, it is much easier and more efficient for an advertiser to reach a high proportion of its target demographic on broadcast television.  Media buyers often buy time on subscription television channels not so much as a substitute for broadcast television, but rather to supplement a broadcast television message, to reach a narrow demographic with greater frequency (e.g., 18–24 year olds) or to target narrow geographic areas within a DMA.  A small but significant price increase by broadcast television spot advertising providers would not be made unprofitable by advertisers switching to advertising on subscription television channels.

16.     Internet-based media is not currently a substitute for broadcast television spot advertising.  Although Online Video Distributors ("OVDs") such as Netflix and Hulu are important sources of video programming, as with cable television advertising, the local video advertising of OVDs lacks the reach of broadcast television spot advertising.  Non-video Internet advertising, e.g., website banner advertising, lacks the important combination of sight, sound, and motion that gives television its impact.  Consequently, local media buyers currently purchase Internet-based advertising primarily as a supplement to broadcast television spot advertising, and a small but significant price increase by broadcast television spot advertising providers would not be made unprofitable by advertisers switching to Internet-based advertising.

17.     Broadcast television stations generally can identify advertisers with strong preferences for using broadcast television advertising.  Broadcast television stations negotiate prices individually with advertisers and consequently can charge different advertisers different prices.  During the individualized negotiations on price and available advertising slots that commonly occur between advertisers and broadcast television stations, advertisers provide stations with information about their advertising needs, including their target audience.  Broadcast television stations could profitably raise prices to those advertisers who view broadcast television as a necessary advertising medium, either as their sole means of advertising or as a necessary part of a total advertising plan.

18.     Accordingly, the sale of broadcast television spot advertising is a line of commerce under Section 7 of the Clayton Act and a relevant product market for purposes of analyzing the proposed acquisition under Section 7 of the Clayton Act.

**B.     The HLLY DMA is the Relevant Geographic Market**

19.     DMAs are geographic units defined by the A.C. Nielsen Company, a firm that surveys television viewers and furnishes broadcast television stations, advertisers, and advertising agencies in a particular area with data to aid in evaluating audience size and composition.  DMAs are ranked according to the number of households therein, and the HLLY DMA is the 43rd largest in the United States, containing 724,000 television households.  The HLLY DMA includes each of its named cities and the surrounding ten counties in central Pennsylvania.  Signals from broadcast television stations located in the HLLY DMA reach viewers throughout the DMA, but signals from broadcast television stations located outside the DMA reach few viewers within the DMA.  DMAs are used to analyze revenues and shares of broadcast television stations in the *Investing in Television BIA Market Report 2014* (1st edition), a standard industry reference.

20.     Advertisers use broadcast television stations within the HLLY DMA to reach the largest possible number of viewers across the DMA.  Some of these advertisers are located in the DMA and need to reach customers there; others are regional or national businesses that want to target consumers across the DMA.  Advertising on television stations outside the HLLY DMA is not an alternative for these advertisers because such stations cannot be viewed by a significant number of potential customers within the DMA.  Thus, if there were a small but significant increase in broadcast television spot advertising prices within the HLLY DMA, an insufficient number of advertisers would switch advertising purchases to television stations outside the DMA to render the price increase unprofitable.

21.     Accordingly, the HLLY DMA is a section of the country under Section 7 of the Clayton Act and a relevant geographic market for the sale of broadcast television spot advertising for purposes of analyzing the proposed acquisition under Section 7 of the Clayton Act.

        **C.**     **The Proposed Acquisition would Harm Competition in the HLLY DMA**

22.     Broadcast television stations compete for advertisers through programming that attracts viewers to their stations.  In developing their own programming and in considering the programming of the networks with which they may be affiliated, broadcast television stations try to select programs that appeal to the greatest number of viewers and to differentiate their stations from others in the same DMA by appealing to specific demographic groups.  Advertisers, in turn, are interested in using broadcast television spot advertising to reach both a large audience and a high proportion of the type of viewers that are most likely to buy their products.

23.     Broadcast station ownership in the HLLY DMA is already significantly concentrated.  Four stations, each affiliated with a major network, had more than 90% of gross advertising revenues in 2013, with Sinclair's WHP-TV having a revenue share of nearly 16%

and Perpetual's WHTM-TV having a revenue share of nearly 17%. Together, the three stations run by Sinclair and Perpetual have approximately 38% of all television station gross advertising revenues in the HLLY DMA.

24. Using the Herfindahl-Hirschman Index ("HHI"), a standard measure of market concentration (defined and explained in Appendix A), a combination of WHTM-TV, WHP-TV, and WLYH-TV in the HLLY DMA would result in both a large change in concentration and a highly concentrated market, increasing the HHI by 693 points from 2615 to 3308. Under the Horizontal Merger Guidelines issued by the Department of Justice and Federal Trade Commission, mergers resulting in highly concentrated markets (with an HHI in excess of 2500) and with an increase in the HHI of more than 200 points are presumed to be likely to enhance market power.

25. In addition to increasing concentration in the HLLY DMA, the transaction combines stations that are close substitutes and vigorous competitors in a market with limited alternatives. Their respective affiliations with CBS and ABC, and their local news operations, lead the stations to have a variety of competing programming options that are often each other's next-best or second-best substitutes for many advertisers. WHP-TV and WHTM-TV both have viewership strengths in the northern counties of the geographically disperse Harrisburg-Lancaster-Lebanon-York DMA, making them particularly close substitutes. Moreover, WHP-TV and WHTM-TV appeal to similar demographic groups, making them close substitutes for many viewers and advertisers.

26. Advertisers benefit from Sinclair's and Perpetual's head-to-head competition in the sale of broadcast television spot advertising in the HLLY DMA. During individual price negotiations between advertisers and television stations in the HLLY DMA, advertisers are able

to "play off" the stations against each other and obtain competitive rates for programs targeting similar demographic groups.

27.     Advertisers purposefully spread their advertising dollars across numerous spot ad suppliers to reach most efficiently their marketing goals.  After the proposed acquisition, advertisers in the HLLY DMA would likely find it more difficult to "buy around" WHP-TV, WHTM-TV, and WLYH-TV in response to higher advertising rates, than to "buy around" Sinclair's WLYH-TV and WHP-TV, *or* Perpetual's WHTM-TV, separately, as they could have done before the proposed merger.  The presence of the remaining, independent stations alone would not be sufficient to enable enough advertisers to "buy around" WHP-TV, WHTM-TV, and WLYH-TV to defeat a price increase.  Because a significant number of advertisers would likely be unable to reach their desired audiences as effectively unless they advertise on at least one station that is controlled by Sinclair, those advertisers' bargaining positions will be weaker after the proposed acquisition, and the advertising rates they pay would likely increase.

28.     Accordingly, the proposed acquisition is likely to substantially reduce competition and will restrain trade in the sale of broadcast television spot advertising in the HLLY DMA.

### D.      Lack of Countervailing Factors

#### 1.      Entry and Expansion Are Unlikely

29.     De novo entry into the HLLY DMA is unlikely. The FCC regulates entry through the issuance of broadcast television licenses, which are difficult to obtain because the availability of spectrum is limited and the regulatory process associated with obtaining a license is lengthy. Even if a new signal became available, commercial success would come, at best, over a period of many years.  In the HLLY DMA, all of the major broadcast networks (CBS, NBC, ABC, FOX) are already affiliated with a licensee, the contracts last for many years, and the broadcast

networks rarely switch licensees when the contracts expire. Thus, entry into the HLLY DMA broadcast television spot advertising market would not be timely, likely, or sufficient to deter Sinclair from anticompetitive increases in price or other anticompetitive conduct after the proposed acquisition occurs.

30. Other broadcast television stations in the HLLY DMA could not readily increase their advertising capacity or change their programming sufficiently in response to a price increase by Sinclair. The number of 30-second spots in a DMA is largely fixed by programming and time constraints. This fact makes the pricing of spots very responsive to changes in demand. During so-called political years, for example, political advertisements crowd out commercial advertising and make the spots available for commercial advertisers more expensive than they would be in nonpolitical years. Adjusting programming in response to a pricing change is risky, difficult, and time-consuming. Network affiliates are often committed to the programming provided by the network with which they are affiliated, and it often takes years for a station to build its audience. Programming schedules are complex and carefully constructed, taking many factors into account, such as audience flow, station identity, and program popularity. In addition, stations typically have multi-year contractual commitments for individual shows. Accordingly, a television station is unlikely to change its programming sufficiently or with sufficient rapidity to overcome a small but significant price increase imposed by Sinclair.

### 2. The Alleged Efficiencies Do Not Offset the Harm

31. Although Defendants assert that the proposed acquisition would produce efficiencies, they cannot demonstrate acquisition-specific and cognizable efficiencies that would be sufficient to offset the proposed acquisition's anticompetitive effects.

## V. VIOLATIONS ALLEGED

32. Plaintiffs hereby repeat and reallege the allegations of paragraphs 1 through 31 as if fully set forth herein.

33. The proposed acquisition likely would lessen competition substantially in interstate trade and commerce, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The acquisition likely would have the following effects, among others:

   a. competition in the sale of broadcast television spot advertising in the HLLY DMA would be lessened substantially;

   b. competition among WHP-TV, WHTM-TV, and WLYH-TV in the sale of broadcast television spot advertising in the HLLY DMA would be eliminated; and

   c. the prices for spot advertising time on broadcast television stations in the HLLY DMA would likely increase.

35. Unless restrained, the acquisition will violate Section 7 of the Clayton Act, 15 U.S.C. § 18.

## VI. REQUEST FOR RELIEF

36. Plaintiffs request:

   a. that the Court adjudge the proposed acquisition to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

   b. that the Court permanently enjoin and restrain Defendants from carrying out the transaction, or entering into any other agreement, understanding, or plan by which Perpetual would be acquired by Sinclair, unless Defendants divest WHTM-TV in

    accordance with the proposed Final Judgment and Hold Separate Stipulation and Order filed concurrently with this Complaint;

c. that the proposed Final Judgment giving effect to the divestiture be entered by the Court after compliance with the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16;

d. that the Court award Plaintiffs the costs of this action; and

e. that the Court award such other relief to Plaintiffs as the Court may deem just and proper.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES:

_____
William J. Baer (D.C. Bar #324723)
Assistant Attorney General

_____
Leslie C. Overton (D.C. Bar #454493)
Deputy Assistant Attorney General

_____
Patricia A. Brink
Director of Civil Enforcement

_____
Scott A. Scheele (D.C. Bar #429061)
Chief, Telecommunications and Media Section

_____
Lawrence M. Frankel (D.C. Bar #441532)
Assistant Chief
Telecommunications and Media Section

_____
Owen Kendler
Assistant Chief
Telecommunications and Media Section

_____
David B. Lawrence*
Maureen Casey (D.C. Bar #415893)
Alvin Chu
Lorenzo McRae (D.C. Bar #473660)
Robert E. Draba (D.C. Bar #496815)
Trial Attorneys

United States Department of Justice
Antitrust Division
Telecommunications and Media Section
450 Fifth Street, N.W., Suite 7000
Washington, D.C. 20530
Phone: 202-532-4698
Facsimile: 202-514-6381
Email: David.Lawrence@usdoj.gov

*Attorney of Record

Dated: July 15, 2014

FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA:

Kathleen G. Kane
Attorney General

James A. Donahue, III
Executive Deputy Attorney General
Public Protection Division

Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section

*/s/ Joseph S. Betsko*
Joseph S. Betsko (PA Bar #82620)
Senior Deputy Attorney General
Antitrust Section

Office of Attorney General
14th Floor, Strawberry Square
Harrisburg, PA  17120
Phone:  (717) 787-4530
Facsimile:  (717) 787-1190
E-mail:  jbetsko@attorneygeneral.gov

Dated:  July 15, 2014

APPENDIX A

## Herfindahl-Hirschman Index

The term "HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$). The HHI takes into account the relative size distribution of the firms in a market. It approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 points when a market is controlled by a single firm. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases. Markets in which the HHI is between 1,500 and 2,500 points are considered to be moderately concentrated, and markets in which the HHI is in excess of 2,500 points are considered to be highly concentrated. *See* U.S. Department of Justice & FTC, *Horizontal Merger Guidelines* § 5.3 (2010). Transactions that increase the HHI by more than 200 points in highly concentrated markets presumptively raise antitrust concerns under the *Horizontal Merger Guidelines* issued by the Department of Justice and the Federal Trade Commission. *See id.*