**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *et al.,* | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Civil Action No. 14 -cv- 01186 (TSC) |
| | ) |
| | ) |
| **SINCLAIR** | ) |
| **BROADCAST GROUP, INC.,** *et al.,* | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OPINION**

The United States of America and the Commonwealth of Pennsylvania (the

"Commonwealth") bring this case against Sinclair Broadcast Group, Inc. ("Sinclair") and

Perpetual Corporation ("Perpetual") for alleged antitrust violations arising out of Sinclair's

proposed acquisition of Perpetual.  The United States and the Commonwealth allege that the

proposed acquisition would likely substantially lessen competition in the sale of broadcast

television spot advertising in the Harrisburg-Lancaster-Lebanon-York, Pennsylvania Designated

Market Area[1] ("HLLY DMA"), in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

(ECF No. 1, Compl. 1–2; ECF No. 3, Competitive Impact Statement ("CIS")).

Pending before the Court is the United States' Motion and Memorandum for Entry of the

Proposed Final Judgment (ECF No. 14).  While the Motion was filed by the United States, the

attached Certificate of Compliance indicates that the Commonwealth, Sinclair, and Perpetual

join in the Motion.  For the following reasons, the Court grants the Motion.

---

[1] A DMA is a geographic unit defined by the A.C. Nielson Company for television ratings and advertising purposes. (CIS 4; *see also* Compl. ¶ 19).

I.      **BACKGROUND**

      a.   **Defendants and the proposed acquisition**

    Sinclair, a Maryland corporation headquartered in Hunt Valley, Maryland, owns or

operates over 145 commercial broadcast television stations in 70 markets in the United States,

including two in the HLLY DMA, known as WHP-TV and WLYH-TV.  (CIS 2).[2]  Perpetual, a

Delaware corporation headquartered in Arlington, Virginia, owns and operates American

Broadcasting Company ("ABC") affiliated full-power broadcast television stations in six DMAs,

including the only ABC affiliate serving the HLLY DMA, known as WHTM-TV.  (*Id*.).  On July

28, 2013, Sinclair and Perpetual executed a Purchase Agreement whereby Sinclair would

purchase all of the outstanding voting securities of Perpetual.  (*Id*. at 3).

      b.   **Alleged harm resulting from the acquisition**

    Pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or

"Tunney Act"), 15 U.S.C. § 16(b)–(h), the United States filed a CIS with the Complaint to

explain the anti-competitive impact of Sinclair's acquisition of Perpetual.

    The relevant product market for purposes of Section 7 of the Clayton Act is that of

television spot advertising.  (Compl. ¶¶ 13–18; CIS 3).  Television stations sell advertising time

during broadcasts to those seeking to reach viewers attracted by television programming.  (CIS

3).  Advertisers purchase broadcast "spot" advertising to target viewers within specific

geographic markets.  (*Id*.).  Spot advertising differs from network and syndicated television

advertising, which are sold nationally by major television networks and by producers of

syndicated programs and broadcast in every market where the network or program is broadcast.

(*Id*.).  Due to its unique combination of sight, sound, and motion, and its expansive reach to

particular geographic markets, television spot advertising has no close substitute for a significant

---

[2] For the sake of simplicity, the Court cites the CIS for information that appears in both the Complaint and CIS.

number of advertisers.  (*Id*.).  Through information obtained during individual price negotiations, stations can readily identify advertisers with strong preferences for using broadcast television spot advertising and charge different advertisers different prices.  (*Id*. at 4).  With no close product substitute, a small but significant increase in the price of broadcast television spot advertising is unlikely to cause enough advertising buyers to switch their purchases to other media to make that price increase unprofitable.  (*Id*.).

The relevant geographic market for purposes of Section 7 of the Clayton Act is the HLLY DMA, which is the 43rd largest in the United States and contains over 740,000 households.  (*Id*.).  Advertisers, whether located within or outside the HLLY DMA, use stations within that DMA to reach the most viewers residing there.  (*Id*.).  Advertising on stations outside the HLLY DMA is not a substitute for advertising on stations within the HLLY DMA, because signals from stations outside that DMA reach relatively few viewers residing within it.  (*Id*.).

Sinclair owns and operates CBS-affiliated WHP-TV and, through an existing agreement with a non-party, operates CW-affiliated WLYH-TV, and therefore controls the advertising revenue of two of six broadcast stations within the HLLY DMA.  (*Id*.).  Post-acquisition, Sinclair would control the advertising revenue of three of six broadcast television stations within that DMA:  WHP-TV (CBS), WLYH-TV (CW), and WHTM-TV (ABC).  (*Id*.).  The proposed acquisition would increase Sinclair's share of broadcast television spot advertising revenue from 21 to 30 percent and would substantially increase the already high market concentration in the HLLY DMA.  (*Id*.).

The United States found that the proposed acquisition would likely substantially lessen competition in the sale of broadcast television spot advertising in the HLLY DMA.  (*Id*. at 3). Competition between WHTM-TV, WHP-TV, and WLYH-TV for the sale of broadcast television

spot advertising in the HLLY DMA would be eliminated entirely, and therefore the prices for broadcast television spot advertising within the HLLY DMA would likely increase.  (*Id*. at 5). The United States also found that the proposed acquisition would both increase market concentration and result in a highly concentrated market under the Horizontal Merger Guidelines issued by the Department of Justice and the Federal Trade Commission.  (*Id.*; *see also* Compl. App. A).

In addition to increasing market concentration, the United States concluded that the proposed acquisition combines stations in the HLLY DMA that are "close substitutes and vigorous competitors in a market with limited alternatives."  (CIS 6).  For example, WHP-TV and WHTM-TV and their affiliations with CBS and ABC, respectively, along with their local news coverage, offer a variety of competing programming options that are often substitutes for many advertisers.  (*Id*.).  The stations also share strong viewership in the northern counties of the geographically diverse HLLY DMA and appeal to similar demographic groups.  (*Id*.).

The only local ABC affiliate, WHTM-TV, vigorously competes with Sinclair's CBS and CW affiliates (WHP-TV and WLYH-TV, respectively) "for the business of local, regional, and national firms seeking spot advertising in the HLLY DMA."  (*Id*.).  Direct competition for spot advertising between WHTM-TV and the Sinclair's existing two stations benefits advertisers seeking to target similar demographics since those advertisers can pit the stations against each other.  (*Id*.).  The United States concluded that Sinclair's acquisition of WHTM-TV and resulting control over three of the six broadcast television stations in the HLLY DMA would eliminate this competition and thereby likely enable Sinclair to raise prices unilaterally for spot advertising on its stations.  (*Id*.).

The United States also concluded that absent divestiture, any entry or expansion in the HLLY DMA broadcast television spot advertising market would not be timely, likely, or sufficient to prevent anticompetitive harm. (*Id.* 6). A new station, should it first overcome the hurdle of obtaining an FCC license, would likely not achieve commercial success for at least a period of years. (*Id.* at 7). Alternatively, existing stations in the HLLY DMA could not readily increase their advertising capacity or alter their programming enough to offset a price increase by Sinclair given their existing programming schedules and contractual commitments with their affiliated networks. (*Id.*).

### c. Procedural history

On July 15, 2014, the United States and the Commonwealth filed their Complaint, alleging that Sinclair's proposed acquisition of Perpetual violates Section 7 of the Clayton Act. Plaintiffs also filed a proposed Hold Separate Stipulation and Order (ECF No. 2-1) intended to maintain competition during the pendency of the ordered divestitures, and a Proposed Final Judgment (ECF No. 2-2) to ultimately ensure Defendants' prompt divestiture of specific "Divestiture Assets" and preserve competition for broadcast spot advertising within the HLLY DMA. On July 21, 2014, the Court issued the Hold Separate Stipulation and Order.

The term "Divestiture Assets," as used in the parties' filings and herein, includes all assets used primarily in the operation of WHTM-TV and are the same assets that Sinclair would have acquired from Perpetual under the Purchase Agreement. (CIS 7). [3] These assets include real property, equipment, FCC licenses, contracts, intellectual property rights, programming materials, and customer lists maintained by Sinclair or Perpetual in connection with WHTM-TV. (*Id.*) They do not include assets that are not primarily used in the operation of WHTM-TV but

---

[3] *See* the Final Judgment, issued this same day, for a complete and operative definition of the Divestiture Assets.

are instead maintained at the corporate level and used to support multiple stations, such as back-office systems and other corporate-level assets.  (*Id*. 7–8).

Subject to the Court's Hold Separate Stipulation and Order, Defendants were permitted to consummate the proposed acquisition subject to ongoing requirements that Defendants continued operating WHTM-TV as a competitively independent, economically viable business uninfluenced by Sinclair, with the effect of maintaining competition in the relevant marked until divestiture occurred.  On August 1, 2014, pursuant to Section VIII of the proposed Final Judgment, Sinclair notified the United States that it had executed a definitive agreement with non-party Media General Operations, Inc. ("Media General") for Media General to acquire the Divestiture Assets.  (Mot. 2).  Twelve days later, the FCC approved the assignment of the WHTM-TV station license to Medial General, and the transaction closed on September 2, 2014. (*Id*.).

Defendants filed their Joint Tunney Act Notice of Written or Oral Communications, in compliance with 15 U.S.C. § 16(g), on July 21, 2014.  Pursuant to the Act, the United States filed the Proposed Final Judgment and CIS with the Court simultaneously with the Complaint, and published the Proposed Final Judgment and CIS in the Federal Register on July 23, 2014, *see* 79 Fed. Reg. 42,817 (July 23, 2014).  (ECF No. 14-1, Cert. of Compliance 1).  Further, the United States published summaries of the terms of the Proposed Final Judgment and CIS, together with directions for submitting written comments, in *The Washington Post* for seven days between July 22 and 28, 2014.  (*Id*.).  The sixty-day period for public comments ended on September 26, 2014.  (*Id*.).  The United States received no responsive written comments.  (*Id*. 2).

Since divestiture has occurred, the Divestiture Assets are now owned by Media General, and all requirements of the Tunney Act have been met, the parties move the Court to enter their Proposed Final Judgment.

## II.   ANALYSIS

### a.   Standard of review

The Tunney Act states:

(1) Before entering any consent judgment proposed by the United States under this section, the court shall determine that the entry of such judgment is in the public interest. For the purpose of such determination, the court shall consider--

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

(2) Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene.

15 U.S.C. § 16(e).

In making its determination, the Court may not simply "rubberstamp" the government's proposal; instead, it must engage in an "'independent' determination of whether a proposed settlement is in the public interest." *United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 15 (D.D.C. 2007) (quoting *United States v. Microsoft Corp.*, 56 F.3d 1448, 1458 (D.C. Cir. 1995)). "[A] district court is not permitted to reject the proposed remedies merely because the court believes other remedies are preferable," *Id.* at 15 (citation omitted), and "should be deferential to

the government's prediction of the proposed remedies." *Id.*; *see also United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) ("[A] proposed consent decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is within the reaches of the public interest.") (internal quotations and citations omitted). In sum, "the relevant inquiry is whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlement are reasonable." *SBC Commc'ns*, 489 F. Supp. 2d at 15–16; 17.

The court may not, however, "make a *de novo* determination of facts and issues" in conducting its public interest inquiry. *United States v. Western Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993), *cert. denied*, 510 U.S. 984 (1993) (internal quotation and citation omitted). Rather, "[t]he balancing of competing social and political interests affected by a proposed antitrust decree must be left, in the first instance, to the discretion of the Attorney General." *Id.* (internal quotation and citation omitted). The court should therefore reject the proposed final judgment only if "it has exceptional confidence that adverse antitrust consequences will result— perhaps akin to the confidence that would justify a court in overturning the predictive judgments of an administrative agency." *Microsoft*, 56 F.3d at 1460 (internal quotations and citation omitted); *see also SBC Commc'ns, Inc.*, 489 F. Supp. 2d at 15–16 (concluding that the 2004 amendments to the Tunney Act did not address or undermine the deferential standard of review articulated in *Microsoft*).

The United States received no public comments in response to the CIS and Proposed Final Judgment and therefore the parties now jointly seek entry of the Proposed Final Judgment without further hearings. (Cert. of Compliance 2). For these reasons and pursuant to its

authority under 15 U.S.C. § 16(e)(2), the Court finds no compelling reason to conduct a hearing to aid its public interest determination.

### b.  Public interest determination

In this case, whether the settlement is in the public interest depends on the adequacy of the divestiture of the WHTM-TV assets.  If there is a factual basis for concluding that the divestiture is a reasonably adequate remedy for the harm alleged in the Complaint, then the settlement should be approved; if not, it should be rejected.  The United States indicates that it considered no determinative materials or documents within the meaning of the APPA in formulating the Proposed Final Judgment.  (CIS 15).  Therefore, the Court focuses solely on the CIS.

The impact of the Proposed Final Judgment is to eliminate the anticompetitive effect Plaintiffs allege in their Complaint.  That is, the sale of the WHTM-TV Divestiture Assets to Media General precludes any increase in broadcast television spot advertising in the HLLY DMA that would result directly from Sinclair's ownership of three of the six broadcast television stations in that market.  The Court finds that the Proposed Final Judgment includes adequate provisions in Section X enabling the Department of Justice to ensure compliance and enforcement, and detailed provisions in Section XI precluding reacquisition and other detrimental activities short of reacquisition.  By its terms, the Proposed Final Judgment will expire in ten years and the Court shall retain jurisdiction over it for purposes of enforcement, modification, and violation.  Lastly, the Court considers that the parties agreed to the terms of the Proposed Final Judgment as well as its entry.

Perhaps because divestiture and the Proposed Final Judgment were designed to eliminate the anticompetitive harm it alleged, the United States has not proposed any alternative remedies

short of a full trial on the merits. Given the parties' full compliance with the Tunney Act and the absence of any public comments, the Court discerns no public benefit to a trial instead of accepting the parties' proposed resolution of this matter.

## III.  CONCLUSION

The Court is satisfied with the parties' compliance with the Tunney Act and the consummated sale of the Divestiture Assets. Further, the Court finds on the record before it a factual foundation for the government's decisions such that the government's conclusions regarding the Proposed Final Judgment are reasonable, and ultimately that entry of the Proposed Final Judgment is in the public interest.

Accordingly, Plaintiff the United States' Motion and Memorandum for Entry of the Proposed Final Judgment (ECF No. 14) is **GRANTED**. The Final Judgment shall issue separately.

Date:  November 25, 2014

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge